UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.  CASE NO. 8:18-cr-460-T-02AEP

JOSEPH DAVID CALTAGIRONE

**SENTENCING MEMORANDUM**

The United States files this sentencing memorandum requesting that this Court sentence the defendant, Joseph David Caltagirone, to a high-end guideline range sentence. In support thereof, the United States submits as follows:

**I.  Background**

On April 11, 2018, Tampa Police Department ("TPD") Bomb Squad Officers were training at a facility on North 12th Street, Tampa, Florida. At approximately 4:20 p.m., they heard a loud explosion. Members of the TPD Bomb Squad left the building where they were training and saw a greyish-white smoke plume traveling from north to south above a backyard located near the corner of North 12th Street and East Columbus Drive, Tampa, Florida 33605. This location, just north of Ybor City, is a densely populated, residential neighborhood where homes sit in close proximity to each other.

When TPD bomb squad officers entered the backyard of that address, they smelled what they recognized to be burnt powder, saw a blast crater, and found a PVC-pipe end cap on the ground in the yard. TPD Officers then canvassed the

neighborhood. One resident stated that she had seen her neighbors "Joseph" and "David" running into a nearby house. Police arrived at that house—later identified as Caltagirone's residence—and encountered the defendant, Joseph David Caltagirone, and his associate, M.D.R. Caltagirone stated that he and M.D.R. had been making rockets and had set off a rocket, which exploded.

TPD bomb technicians searched Caltagirone's house. During their search, law-enforcement officers saw several containers that contained powdery substances. They discovered a large container with white powder inside, labeled as "KNO3." KNO3 is the chemical formula for potassium nitrate. They also saw a container with a dark material inside, labeled as "BP W/ Milled KNO3." Officers found a box containing various components, including: a piece of PVC pipe with a plugged end; a hobby fuse; and precursor chemicals labeled as 3 lbs. potassium nitrate, 1 lb. airfloat charcoal, and 1 lb. sulfur. Potassium nitrate, charcoal, and sulfur are precursor chemicals utilized in the manufacturing of homemade black powder.

Law-enforcement officers also discovered a red solo cup on the floor next to the above-mentioned chemicals and containers. Inside the red solo cup, officers found a white polyvinyl chloride (PVC) pipe with end caps on each side. The pipe was arranged vertically inside the cup. An x-ray of the cup and PVC pipe revealed powder inside the pipe. Law-enforcement officers also searched the upstairs of the residence. There, they discovered Tannerite. Tannerite is a binary exploding target material consisting of ammonium nitrate and aluminum powder.

TPD officers then took Caltagirone to the Tampa Police Department. Caltagirone waived his *Miranda* rights and made several statements. Caltagirone stated that he had constructed two devices: a rocket/missile device that had exploded in the backyard and the device discovered inside a red solo cup. Regarding the rocket/missile device, he stated that he had used a one-inch-by-six-inch piece of schedule 40 PVC pipe. He put clay in one end of the pipe and then glued a PVC end cap over that end. He drilled the PVC end cap and inserted a piece of fuse in order to ignite the rocket. He filled the pipe approximately three quarters full with potassium nitrate, charcoal, and sulfur. He crumpled up a piece of aluminum foil and stuffed it into the pipe to separate the filler from the second end cap, which he had glued on the end of the pipe. He then attached a guide rod to the side of the pipe by gluing a syringe to the side of the pipe to hold the guide rod. When he lit the fuse, the rocket exploded and never traveled vertically.

A Destructive Device Determination conducted by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) concluded that the rocket/missile device, a rocket motor, was constructed using a length of PVC pipe, which was sealed at one end with a PVC end cap and contained a quantity of explosive powder identified through laboratory analysis as a nitrate explosive mixture. The other end had been plugged with clay and an improvised venturi. The end cap had been sealed to the pipe using a PVC-based adhesive. According to the report, the absence of any electrical or mechanical firing system, taken with statements made by the device maker, indicate that a length of burning-type fuse was used to initiate the explosive

3

powder. Lighting the fuse of the rocket motor, after a delay, had ignited the explosive powder, causing the device to explode. This explosion projected PVC fragments at high velocities in all directions.

The second device that Caltagirone had designed and constructed, found inside a red solo cup, was a destructive device. The device had been constructed using a length of PVC pipe that was sealed at each end with PVC end caps. The ends had been secured in place with a PVC-based adhesive. The pipe contained an explosive mixture identified through laboratory analysis as a mixture of prilled ammonium nitrate and aluminum, commonly known as Tannerite. One of the end caps was modified by having a hole drilled through its center face. An improvised initiator had been constructed using two lengths of multi-strand wire with a smaller diameter length of single-strand wire connected between the exposed ends of the multi-strand wire. The wire was then placed into a length of plastic straw that contained a small quantity of an explosive mixture identified through laboratory analysis as a chlorate/perchlorate explosive mixture. The initiator had been passed through the hole in the end cap and secured in place with an adhesive. Applying electrical current to the wires would have caused the bridge-wire to heat up and ignite the explosive powder in the straw, causing an explosion. This explosion could have caused the explosive mixture in the pipe (Tannerite) to explode, which, in turn, would have projected PVC fragments at high velocities in all directions.

Caltagirone knowingly designed, constructed, and possessed at least two, completed improvised devices—(1) the rocket motor that he and M.D.R. had detonated, which was an explosive device but not a destructive device under 26 U.S.C. § 5845(f)(3), and, (2) a device discovered in a red solo cup, which was a destructive device under 26 U.S.C. § 5845(f)(3). The destructive device was not registered to Caltagirone or to M.D.R. in the National Firearms Registration and Transfer Record.

## II. Presentence Investigation Report

On March 20, 2019, the U.S. Probation Office issued its Final Presentence Investigation Report (PSR). Doc. 76. Caltagirone's applicable guidelines range for the underlying offenses is 24–30 months; he has a criminal history category of I; and the applicable period of supervised release is one to three years. The United States has one outstanding objection to the final PSR: (1) Caltagirone's guideline range should be increased two levels under §3B1.3 because he used a special skill to build the destructive device that he unlawfully possessed. Were the court to sustain the United States' objection, Caltagirone's total offense level would be 19, resulting in a guideline range of 30–37 months.

### A. Use of Special Skill, USSG §3B1.3

Caltagirone's guideline range should be increased two levels under §3B1.3 because he used a special skill to significantly facilitate the commission of the offense—that is to build the destructive device that he unlawfully possessed. A special skill under §3B1.3 refers to "a skill not possessed by members of the general

5

public and usually requiring substantial education, training or licensing." §3B1.3 App.n. 4. The bar for this enhancement is not high. If an "average person off the street" does not possess the skill, then the skill is considered "special" for the purposes of applying the enhancement. *E.g.*, *United States v. Calderon*, 127 F.3d 1314, 1339 (11th Cir.1997*); United States v. De La Cruz Suarez*, 601 F.3d 1202, 1219 (11th Cir. 2010).

Most members of the general public would not be able to build a pipe bomb from scratch in a non-laboratory setting like Caltagirone. To accomplish this end, he leveraged his education, work experience, a technical skills gained from internet research.

To build the device, Caltagirone needed familiarity with chemistry to mix and employ certain explosive agents like Tannerite and black powder—both of which were located in his residence. Catagirone also manufactured his own blasting caps from scratch—a difficult task that the average person on the street could not easily accomplish. Caltagirone admitted post-*Miranda* that he went on numerous websites to learn about "pyrotechnics." He explained how he would utilize a rock tumbler to process the potassium nitrate in order to break down the substance to a fine powder, making it a more powerful propellant. He also described how the process involves mixing the potassium nitrate with sugar, and how he would make black powder by mixing the potassium nitrate with sulphur and charcoal. Regardless of whether Caltagirone acquired this know-how in a classroom setting, work

environment, through armature research, or through years of trial and error, the results of Caltagirone's work speaks for itself.

Moreover, another aspect of Caltagirone's pipe bomb and other devices independently supports the special skill enhancement—Caltagirone designed and built them to be capable of remote detonation through electric current. *See* Attachment A at 2. According to ATF's peer-reviewed final destructive device report, "applying electrical current to the wires would cause the bridge-wire to heat up and ignite the explosive powder in the straw causing an explosion." Attachment A. Law-enforcement officers responding to the scene found an electric chord in the backyard next to a planter, attached to a PVC device. Caltagirone buried the chord and used it to detonate his devices. He attempted to detonate the destructive device through this method, but the device failed. Put simply, Caltagirone's engineering of his devices to be detonated from a distance through electric current requires a familiarity with explosives and electricity that members of the general public do not possess and would not possess without first acquiring a unique skillset.

To accomplish remote detonation by way of electric wire, Caltagirone no doubt also leveraged his familiarity, work experience, education and training in the electrical field. Caltagirone received two Bachelor of Science degrees from Rose-Hulman Institute of Technology, one in mathematics and one in electrical engineering. PSR ¶ 69. His employment history includes over 20 years of work as an electrical engineer and space computer designer at Honeywell Aerospace. PSR ¶ 72.

These characteristics, taken with the offense conduct, far exceed the standard for a two-level special skill enhancement under §3B1.3. *Cf. United States v. Calderon*, 127 F.3d 1314, 1339–40 (11th Cir.1997) (affirming § 3B1.3, special skill enhancement for appellants who were convicted for cocaine importation and who specifically captained a cocaine–laden, 38–foot cabin cruiser from the Bahamas to South Florida at night with only a chart and a compass and without lights to elude detection by law enforcement agents); *United States v. Carlson*, 87 F.3d 440, 446–47 (11th Cir.1996) (upholding a § 3B1.3, special skill enhancement for chemist who pled guilty to the manufacture and distribution of illegal drugs and who developed laboratories in Panama and Brazil to produce these drugs for distribution); *United States v. Malgoza*, 2 F.3d 1107, 1110–11 (11th Cir.1993) (per curiam) (upholding § 3B1.3, special skill enhancement for radio operator convicted of conspiring to import cocaine for his knowledge of radio frequencies and his ability to set the necessary equipment to contact the source of the cocaine in Colombia).

### III. <u>Argument for High-End Guideline Sentence</u>

The facts of this case and Caltagirone's conduct demand a high-end guidelines sentence. Although this investigation did not reveal any ideological, racial, or religious motive behind his building destructive and explosive devices, and although we have no evidence that Caltagirone specifically intended to harm other persons, Caltagorine's criminal conduct was beyond reckless. He not only constructed and possessed multiple explosive devices—he detonated them in an urban area. And he attempted to detonate a *destructive* device. On multiple occasions, Caltagirone

endangered the lives of his mother, friends, neighbors, and other innocents in his neighborhood.

A high-end guideline sentence is necessary here due to the seriousness of the offense, the history and characteristics of the defendant, the need to deter criminal activity, and the importance of protecting the public. *See* 18 U.S.C. § 3553(a). The United States recognizes that this Court may not presume that a guideline-range sentence is reasonable; however, the guidelines remain a significant and pivotal component of the sentencing process. This Court therefore "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009). Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. Additional factors outlined in section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Consideration of these factors warrants a high-end guideline range sentence.

### B. Nature and Circumstances of the Offenses

The nature and circumstances of Caltagirone's offense weigh heavily in favor of a high-end guideline-range sentence. Caltagirone displayed a wanton disregard for the sanctity of life and the property of others in our community. He should not be rewarded by this Court, as his counsel suggests, with a probationary, non-incarcerative sentence.

The life he placed most at risk was that of his elderly mother, whose residence he turned into a makeshift explosives laboratory. The list of precursor chemicals that Caltagirone amassed in his mother's residence is frightening—Tannerite, black power, a nitrate explosive mixture comprised of prilled ammonium nitrate and aluminum, finely powered aluminum, powered charcoal, powered sulfur, powered iron oxide, potassium nitrate, a nitrate explosive mixture comprised of potassium nitrate and sugar. Attachment B; Attachment C.

But Caltagirone's criminal recklessness did not end there. He then manufactured destructive and explosive devices inside the home, and on multiple occasions used the home's backyard as a testing ground for his creations. Those creations included a pipe bomb, pictured below.



And it was not enough for Caltagirone to build these devices in his mother's home. He then attempted to detonate them—on multiple occasions—in her back yard, which sits in an urban area three blocks from an elementary school (Academy Prep Center of Tampa, pictured below). His mother's house is also several blocks from Hillsborough County Community College and Route 4. The explosion that alerted Tampa Bomb Squad members occurred at 4:20pm—when children are commuting home from school. Attachment D.



What is more, this says nothing of Caltagirone's immediate neighbors. His makeshift explosives testing ground—his mother's backyard on 17th Avenue—is nestled beside



other homes in a densely populated neighborhood. Had the destructive device that he built not failed when Caltagirone attempted to detonate it, the device would have projected PVC fragments at high velocities in all directions. Those fragments would likely have caused damage to property and might have even resulted in serious injury or death to innocent people in the area. *See* Attachment A. Indeed, the explosive device that Caltagirone successfully detonated— a rocket motor—exploded and projected PVC fragments at high velocities. Attachment A. The explosion was large enough to be seen and heard by law-enforcement officers several blocks away.

Caltagirone is not merely a tinkerer or model rocket hobbyist. He is an individual who consistently displayed a reckless disregard for life and property in his neighborhood for no apparent reason other than his own entertainment.

**C. History and Characteristics of the Defendant**

Caltagirone's history and characteristics do not weigh in favor of a probationary sentence. Nothing in his background—whether it be allegations of sexual abuse or drug addiction—bear on the offense conduct in this case. That said, other family members paint a very different picture of Caltagirone than one

presented by his counsel. Their unsolicited letter details a person who was dealing drugs out of his mother's residence, who has been belligerent with his mother and family members, and who stole money from his 96-year old mother. Attachment F.

In any event, although this Court must consider the history and characteristics of the defendant in crafting Caltagirone's sentence, none of the factors identified in his counsel's sentencing memorandum—even if supported by sufficient indicia of reliability and assumed to be true—warrant a downward variance.

### D. Seriousness of the Crime, Promoting Respect for the Law, and the Need for Just Punishment

As the Eleventh Circuit explained in *United States v. Irey*: "the greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime." 612 F.3d 1160, 1206 (11th Cir. 2010). Congress has expounded that the "just deserts" concept in sentencing is a means of reflecting the "gravity of the defendant's conduct," as well as the "harm done or threatened by the offense." S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59.

1. **Promoting Respect for the Law**

A high-end guidelines sentence is the only sentence that fully promotes respect for the law. The explosive device that Caltagirone detonated in his neighborhood terrorized neighbors and the greater Tampa Bay area. The explosion and Caltagiorne's arrest received news coverage across Florida. *See, e.g.*, Attachment F; Attachment G. And the fear stemming from Caltagirone's acts reverberated long after the dust from the explosion had settled. For many weeks, no one—including

law enforcement—knew whether Caltagirone's motives related to terrorism or some other nefarious agenda.

Any sentence other than a high-end guideline range sentence sends the wrong message to the community and does not promote respect for the law. Individuals who build and possess unregistered destructive devices, and then try to set them off in densely populated, urban areas, pose a serious threat to the community. Such conduct does not warrant probation.

Indeed, a sentence of probation is precisely the sentence that Caltagirone's accomplice, M.D.R., projected when boasting to others on Facebook not long after the explosion:

> **Author** ▮▮▮▮▮▮▮▮▮▮
> **Sent** 2018-05-19 04:14:45 UTC
> **Body** I got off cklean after setting a huge bomb off. shook bomb squad training windows and 5 blocks away., I was proud. I got off clean but my bud is fighting fed charges. he will get off though. it was amazing... Fred would be prouuud of me in the name of america!!!

> **Author** ▮▮▮▮▮▮▮▮▮▮
> **Sent** 2018-05-19 04:11:53 UTC
> **Body** Heard about my latest antics? I blew a bomb up in down town tampa. It was crazy!!! ATF, FBI, Bomb Squad, Helicopters, 50 plus TPD Plus major streets blocked offfl

Attachment H.

2. **Adequate Deterrence to Criminal Conduct and Need to Protect the Public from Further Crimes of the Defendant.**

Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. This Court should

14

also impose a high-end guideline range sentence to send a strong warning to other individuals currently involved in or considering similar conduct. Building explosive and destructive devices, improperly storing them without a license, and detonating them in urban areas is unacceptable, anti-social behavior. A high-end guidelines sentence is necessary to deter comparable activities and convey a message that such behavior is unacceptable and will be punished harshly within the Eleventh Circuit.

## IV. Conclusion

This Court should sentence Caltagirone to a high-end guideline range sentence. Nothing in the offense conduct nor in his history and characteristics warrant a downward variance. A high-end guidelines sentence is the only reasonable sentence because it is the only sentence that reflects the seriousness of the Caltagirone's crime and relevant conduct, provides just punishment for the crime, fully protects the community, helps restore confidence in the safety of our neighborhoods, and promotes respect for the law.

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

By: */s/ Francis D. Murray*
Francis D. Murray
Assistant United States Attorney
Florida Bar No. 0108567
400 N. Tampa Street, Ste. 3200
Tampa, FL 33602
Phone: (813) 274-6000
Fax: (813) 274-6103
Email: francis.murray2@usdoj.gov

| U.S. v. Caltagirone | Case No. 8:18-cr-460-T-02AEP |

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Tamara Theiss, Esq.

                                                */s/ Francis D. Murray*
                                                Francis D. Murray
                                                Assistant United States Attorney
                                                Florida Bar No. 0108567
                                                400 N. Tampa Street, Ste. 3200
                                                Tampa, FL 33602
                                                Phone: (813) 274-6000
                                                Fax:   (813) 274-6103
                                                Email: francis.murray2@usdoj.gov